Good morning, Your Honours. My name is Peter Tamayo. I represent Mr. Al Fawadi. This is a case in which it would be fair to say that the defendant was surprised by the sentence. He had expected and entered in a plea agreement and expected to receive a sentence of 12 to 18 months. In fact, he had even hoped to get time served because he had already served about nine months in state prison. The plea agreement did not have a stipulated guideline calculation in it, but the prosecutor had indicated that the likely sentence was 12 to 18 months. That's what the PSR found, and the PSR found no basis for an upward departure or for a variance. Nevertheless, the sentencing judge imposed a sentence of 48 months, three to four times what Mr. Al Fawadi had expected. Right, but isn't that how it works with discretion? Sometimes people will go up, and sometimes people will downward depart. Well, it does, Your Honour, but the guidelines to discretion is an abuse of discretion, and we argue in this case that this did constitute an abuse of discretion because it was based on information which was well known to the prosecutor when he entered into the agreement. It was well known to the judge who took the plea, although another judge handled the sentencing, and it was something that Mr. Al Fawadi had indicated he understood that that was the guideline that he was looking at. Certainly he had no reason to believe that his sentence would be increased that much. You know, he entered into a global plea agreement. His plea agreement contemplated not only that he would enter the guilty plea in a federal court, but that he would enter a guilty plea in the state court, and that he would agree to the order of removal. All of that was part of the original agreement, yet when he gets to sentencing, now suddenly his sentence is tripled. But what was, in terms of the agreement, what actually did the agreement say about sentencing? The agreement did not have anything to say about sentencing. There was no sentencing stipulation in there. The only thing there was was a waiver of the right to appeal of any sentence over 18 months. Over 18 months, right. That is, at best, the source, at least as far as the written record is concerned, of any surprise. Well, no. The prosecutor indicated at the time of the plea that the likely sentence was going to be 12 to 18 months. On the record? I believe so. Okay. And that's certainly what was his understanding. But that raises the question then what exactly are you asking for here? If the issue is that the plea was entered under some kind of mistaken promise or belief in a promise so that it wasn't voluntary and intentional, that would suggest undoing the plea. I'm not sure how you unwind an agreement that covers all of these other prosecuting and administrative agencies. But if the issue is that the sentence was an abuse of discretion, then I suppose the fact that the – and so you're only attacking the sentence. Then I'm not sure how his surprise factors into that. If the plea is legitimate, then I'm not sure that we have anything before us other than was this sentence substantively or procedurally an abuse of discretion? We're arguing a lot, Your Honor. We're asking for a resentencing. We also argue, Your Honor, that – What is the error in the – I mean, your main focus is the obstruction of justice enhancement. Am I right about that? No, Your Honor. My main – I mean, I do argue that. But the main focus is the tripling of the guideline sentence because, after all, the guideline sentence is based on including the obstruction of justice. The 12 to 18 months is what the probation department found in the PSR. So the PSR – so that includes that obstruction. Now, I argue that that obstruction was also an error. But my principal argument here, Your Honor, is that you ought to get back to a resentencing based upon that guideline. We argued, Your Honor, in effect, of counsel at sentencing as well, which, of course, is unusual. Usually that's saved for a 2255. But in this case, practically speaking, there's not going to be a 2255. Mr. Al-Fawadi is already scheduled to be removed from the United States at the completion of his sentence, which will be next year. So by the time he'd have an opportunity to make it, he wouldn't have the opportunity. It's clear, Your Honor, though, that his attorney did not fully contemplate the federal sentencing procedures. He did not make the kind of objections that would have been necessary. And Mr. Al-Fawadi himself had asked for a new attorney to be appointed prior to sentencing, a request that was just ignored by the judge. And that may have been because of the switches of judges at the time. Certainly, Your Honor, what Mr. Al-Fawadi is looking for is to serve as little time in prison as he can. And the only way that's going to happen is if the case can be sent back and he can get a resentencing in a fairly short order. Could I ask, is there any explanation in the record for why the judge calculated the sentence by adjusting the offense level by 10 levels and where that 10 levels might have come from? I don't think there's anything specifically in the record. What I kind of understood was he kind of was explaining how it worked in the guidelines, and he just went to what the range that would have covered the sentence he was imposing. He's been planning to impose. Yes. Of course, I mean, it makes it look like an unexplained sentencing departure when I think as a substantive matter it was a 3553A sentence. But it just seems peculiar to run it through the guidelines. I mean, I can understand if a judge said, well, there's this unexplained factor or factor that isn't really involved in the calculations. And it's analogous to something that would lead to a 10 level offense increase. And therefore, I'm using the guidelines as a guide. And here, that doesn't seem to be what's happening. And in fact, Your Honor, if he was going to do that, I would have thought he would have increased the criminal history category. Yeah. And I'm sure we could find on the charter range that would cover that. And that would make more sense. But remember, Your Honor, his ex-wife had dropped the charges. She hadn't prosecuted those. The state had agreed that they weren't going to go forward with the rape charges in New York State, which are very serious charges. And in this day and age, a DA is not going to likely dismiss a rape charge. And I think that it doesn't really make sense that this sentence was increased by this amount based upon the uncorroborated allegations which had been withdrawn and which the state itself is no longer seeking to prosecute. They reduced it to a contempt. So he pled guilty to a contempt. For violating it. And that worked out to be a sentence concurrent with the federal sentence? Is that how that played out? No, Your Honor. It was consecutive. He served about nine months in state custody. He did not get credit for that. Right. Now, we could quibble whether he would have gotten a few more months. I understand.  Thank you, Your Honor. He served a few minutes. May it please the Court, my name is Stephen Clymer. I represent the United States. I'd like to begin by clarifying the record a little bit. Counsel first referred to an e-mail message that I sent to trial counsel before the guilty plea. That e-mail message repeatedly said that the guideline range was an estimate. I think it said it three times. It also said, I think, three times, that whatever I said as an estimate was not binding on the government. It also said at the end of the message that the government would reserve the right in the plea agreement. I flagged it for defense attorney. It was in a plea agreement. I flagged it in the e-mail message. We might seek a sentence in this case above the guideline range. So in terms of expectations, the e-mail message could have left no expectations about any, quote, likely sentence and made clear that we might be seeking a sentence above the guideline range. At the end of the day, did you seek the above guideline sentence? Yes, Your Honor, I did. We sought a 60-month sentence. We did not, as you asked about, we did not hinge it to guideline offense levels. And I'll get to that point in a minute. So that was the e-mail message. So I don't think the e-mail message could have. And the guidelines estimate was what we call, often call, a so-called Pimentel estimate? Down here, that's what they call them, Pimentel estimates. We don't use that terminology up in the Northern District. But that's what, in effect, that's what it is. Essentially, although I'm not sure, in terms of the culture down here, the significance of that sort of estimate. We made clear, and we made clear in this e-mail message, this was not binding. This was just kind of a ballpark estimate of what it might be. We then get to the plea agreement itself. The plea agreement was silent about any increase for obstruction. It didn't say there would be one. It didn't say there wouldn't be one. Made no mention of it at all. The plea agreement did, however, say whatever the parties say is not binding on the court. That's standard language in our agreements. And the agreement had a specific provision that said the government reserves the right to ask for a sentence above the guideline range. That was in the plea agreement. The court colloquied Mr. Alfawati extensively at the guilty plea. He said he understood it. He had talked to the attorney about it. He had no questions about it. So, again, in terms of expectations, the plea agreement set out what the expectations realistically could have been. Look, I understood, and just to kind of back up because of the order that you're putting in. I mean, I understand that he – there was a – I saw the colloquy about making sure that he understood everything. But you don't dispute that there was no objection to the explanation or the application, right? And wouldn't most folks have expected – I mean, wouldn't that be a thing that a lawyer would do when something was so far out of expectation? If it was indeed out of expectations, perhaps, Your Honor. I would think a lawyer would do that if he had a basis to object to the enhancement. But you're saying because the district court had four different reasons they gave for the upward variance, they thought it was done. Counsel here on appeal faults trial counsel for failing to get a better plea agreement and for failing to make certain objections to things without offering any hint of what trial counsel should have done to get those things. I mean, Mr. Alfawadi is not in a particularly good position to be bargaining for better terms in a plea agreement here. And whether he is or he isn't, it takes two to plea bargain, right? Exactly. It always seems to me hard to say the fault of defense counsel for not getting a better plea deal. He got the plea deal that the government was willing to offer, and then the choice was take it or don't take it. At some point, there's an end of the road to negotiations. Exactly. And the criticism at sentencing for not objecting to certain things, the defense briefs here tell us nothing about what those objections would look like. There was abundant evidence justifying both the enhancement under 3C1.1 and the upward variance. The final point I'll make about the expectations, at the change of plea hearing, again, government counsel, and that was me, explained that I was just given an estimate, and the trial judge, Judge McAvoy, let the defendant know, hey, we can't predict these things. He said that. So, again, any expectations could not have been reasonable here, because nobody created any expectations. And I take it defense counsel did make various arguments for a lower sentence than the government asked for. That is correct, Your Honor. He may have raised certain points. He talked about Mr. Al-Farwadi's perspective, and he filed a sentencing memorandum that made those points. The trial judge didn't find them persuasive, although at the end of the day, the upward variance was less than the government asked for. Back to the upward variance. So my understanding was that the district court primarily relied on four factors. Correct. The membership in the militia, the undocumented travel to support combat operations, the false statements to officials in Turkey regarding status, and then the crime. So he committed including the physical and sexual abuse of the wife after illegally entering the country. Your colleague makes much of the fact that the wife, at least at one point, decided not to press charges. Would you think there would be enough there to support the upward variance if that fourth factor was not given a lot of credence? If I were arguing the case as an advocate, Your Honor, yes, I would. I can't tell you what Judge Sotheby would do. I will say this, though. On the dropped charges, the defendant had a stay-away order. He got out of jail. He moved back in. So it's not clear from the record whether the wife wanted him to or not. There's also an allegation from the wife that he cut all her hair off as a result of her having reported it to the police. So in terms of dropping the charges, there's a lot we don't know about why she may have dropped the charges. In any event, this court has held that dropped charges in a state case can be used by a district court judge to vary upward. There's binding authority on that. And so it was perfectly proper for the district court judge here to rely on the evidence he had, both from the pre-sentence report and from the police reports from Texas and from Onondaga County, New York, to justify that upward variance. Unless the court has other questions, the final observation I'll make is – Can I ask just about the obstruction of justice enhancement? I mean, as you say in your brief, this enhancement is proper where the conduct is purposely calculated to thwart the investigation or prosecution. And these are statements to USCIS. I couldn't find a case involving exactly statements to USCIS and then statements to the FBI. Can you explain, you know, marshal the evidence as to why it was an appropriate finding that the purpose here – it was purposely calculated, it was directed at the criminal investigation, or is it enough that it was directed at deceiving the immigration authorities? The latter, Your Honor, although I think there's evidence of both here. And the reason I say the latter is because, in theory, the facts were almost identical, except that was the SEC. And the defendant made false statements there to the SEC during a deposition. And the criminal investigation hadn't even started at that point. Right. No, I understand the criminal investigation doesn't have to have started. And I read, Fiore, it seems directed – and there's a paragraph that talks about the special character of SEC enforcement actions and subsequent – often subsequent prosecutions. I'm just wondering if the same relationship would hold for these immigration proceedings. Well, it's certainly true, Your Honor, that false statements during immigration proceedings are criminal offenses. And so there's coordination between USCIS and the FBI with respect to those sorts of crimes. Here, as I said, I think both of the things are true because some of the false statements which were made after the FBI had already opened its investigation – And to the FBI. Yeah, exactly, and to the FBI. Some were made to USCIS after the FBI opened its investigation. Some were made to the FBI after it had opened its investigation. But the statements made to the FBI don't count, right, because they weren't made under oath, and there's no evidence that materially impeded the investigation since the facts were already known by the FBI at the time. What the guideline says, Your Honor, is they don't ordinarily count under those circumstances. But here I think it's safe to say the district court judge was entitled to rely on this entire chain of conduct because all the statements went to the same things and the same sorts of options. And the FBI statements, whether or not they independently support the obstruction, sort of put color on – retrospective color on the USCIS statements, I suppose. Yes. The other thing – I mean it also occurred to me that this is not just a sort of garden variety false statement in an immigration context in that it also has this terrorism overlay, which it seems to me would make it more apparent that even to somebody not familiar with what kinds of things get prosecuted and don't get prosecuted, to be worried about some sort of possible criminal consequence that might not apply in every immigration case. I agree, Your Honor. May I finish my answer to Judge Livingston very briefly? I'll also point out that in Zagari, the case that preceded Fiore, there the false statements were made to a state environmental agency called PAID, or P-A-I-D-D-R, and they preceded the criminal investigation. And this Court there also found them sufficient for the obstruction enhancement. Unless the Court has other questions, we ask you to affirm. Thank you for your time. I can start with your question, Judge Lynch, about the overlay of terrorism. There really is no overlay of terrorism in this case like we've seen in some other cases. There's nothing in the record that suggests that Mr. Al-Faradi entered the United States to conduct himself in some sort of way. I don't mean to overplay this or call him a terrorist. I'm just thinking in terms of one's motivation for covering something up, it seems to me there's a pretty strong motivation to cover up that you went to Syria to join an Islamic militia, and you've been specifically asked about that. And of course you're going to deny it. And it seems to me you have a lot of good reasons to deny that, or you'd expect that this would be something that might not only be an immigration problem, but might get you in other kinds of trouble. I understand the argument, Your Honor, but I just fall back on the argument that all that was known at the time the plea agreement was entered. It was known in the PSR. And the probation department found no basis for an upward departure or for a variance. And yet the government came in. Yeah, I understand, Mr. Chairman, but it's not the probation department that has the discretion to impose a sentence as the judge. I know, Your Honor. But of course I hear what you're saying. Thank you, Your Honor. And I'm not trying to overplay the argument either. But I do find it kind of, you know, the statements of the prosecutor that all this was kind of should have been known to Mr. Al-Faradi. Well, then why wasn't it put on the record? Why wasn't there more indication? Suddenly they come in at the sentencing. I mean, it's all explicit in the plea agreement. It's reserved repeatedly that this isn't binding on the judge. And the judge at the plea said, you know, don't count on this because that's just an estimate. And it doesn't bind the judge. That's all routine. Now, I get that people don't always catch that or understand it or even no matter what a lawyer does to explain it, and we don't know what the lawyer did to explain it here. It's maybe not what the ordinary person grasps or expects. But it was said that we're reserving the right to go and ask for more. And then they went and asked for more. They went and asked for, you know, five times what they were syndicating. That's quite a bit more, Your Honor. I mean, that's where we begin to say it pushes the line of an abuse of discretion here. And especially, Your Honor, this is certainly somebody who's not raised in the United States, not a native English speaker, although he does constantly say he speaks English. There was no translation of the agreement in the text. And he says in the record, I didn't understand this in the email that the prosecutor pointed to. So, Your Honor, you have all arguments. I appreciate your time. Thank you both, and we'll take the matter under advisement.